UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case Number: 21- 28 |
| v. ) | |
| ) | **UNDER SEAL** |
| TERRELL ROBISON ICKES, ) | |
| ) | |
| Defendant. ) | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Christopher M. Balchon, Special Agent, Drug Enforcement Administration ("DEA"), Pittsburgh, Pennsylvania, being duly sworn, state as follows:

### AFFIANT'S BACKGROUND

1. I have been employed as a Special Agent with the Drug Enforcement Administration (DEA) since August of 2000. I am currently assigned to the Pittsburgh District Office, located in the Western District of Pennsylvania, and have been so assigned since January of 2007. Prior to my assignment at the Pittsburgh District Office, I was assigned to the New York Field Division Office, located in New York City, New York. Prior to becoming a DEA Agent, I was employed as a police officer and narcotics detective with the City of Pittsburgh Bureau of Police for approximately six years.

2. In my capacity as a DEA Agent in New York City and in Pittsburgh, I have been involved in the execution of hundreds of arrest and search warrants resulting in the seizure of narcotics and/or firearms, and I have written numerous search warrant and criminal complaint affidavits. I have coordinated and participated in numerous "controlled deliveries", "controlled purchases", "undercover purchases", and "reverse operations" involving controlled substances. I have also participated as a case agent in an investigation involving Title III wire intercepts.

3. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, and being trained in: consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing pen register data, conducting court-authorized wire and oral interception electronic surveillance. I have also prepared and executed search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

4. I make this affidavit in support of criminal complaint at the above-captioned case number.

5. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations of, and make arrests for, controlled substance offenses enumerated in Title 21, United States Code.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

7. Furthermore, except where otherwise noted, the information set forth in this Affidavit has been provided to me directly or indirectly by Somerset County Detectives and/or other local law enforcement officers. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken

or whose report I have read and reviewed.  Such statements are among many statements made by others, and are stated in substance, unless otherwise indicated.  Similarly, information resulting from surveillance (except where otherwise indicated) does not set forth my personal observations but rather has been provided directly or indirectly through other law enforcement officers who conducted such surveillance.

## RELEVANT CRIMINAL STATUTE(S)

8. Under Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), it is unlawful for any person to knowingly, intentionally and unlawfully possess with intent to distribute five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

## CONFIDENTIAL SOURCES

9. In this case, as will be discussed below, Somerset County detectives used/relied upon information developed through two Confidential Sources ("CS"), among other information, in order to search a vehicle driven by TERRELL ROBISON ICKES.  Somerset County Detectives and your Affiant know the identities of these CSs.

10. It is the belief of your affiant that, should TERRELL ICKES know the identity of these CSs, the CSs would risk bodily injury or even death, and that other investigations involving these CSs would be compromised.

11. Therefore, to protect the identities of the CSs referenced in this Affidavit, your Affiant will refer to the CSs as CS 1, and CS 2.

12. **CS 1** – Prior to his/her involvement in this case, CS 1 had provided information to Somerset County Detectives that had proven accurate and reliable.  Specifically, in the spring of

2020[1], CS 1 provided information to Somerset County Detectives about the location of a fugitive, and advised detectives that, within the same residence where the fugitive was located, detectives would find controlled substances hidden in a particular place. Investigators responded to the location CS 1 had identified, found the fugitive, and discovered controlled substances in the place where CS 1 said they would.

13. After that incident, CS 1 has continued to cooperate with law enforcement officers and has conducted successful controlled buys[2] at the direction of investigators.

14. While your Affiant knows that CSs often have criminal histories, themselves, CS 1 has no adult criminal convictions. Your affiant knows that CS 1 is a drug user. Your Affiant also knows that CS 1 cooperated/is cooperating with detectives in exchange for leniency on pending/potential charges. Nevertheless, your Affiant submits that the information provided by CS 1 for the purpose of this Affidavit is credible and reliable based on CS 1's history of credibility and reliability, and on corroboration of CS 1's information by other CSs and the investigation.

15. **CS 2** – Prior to this case, CS 2 had not served as a CS with Somerset County detectives. However, on at least one prior occasion, during contact with police, CS 2 had

---

[1] Your Affiant has intentionally omitted the exact date of this incident to protect CS 1's identity.

[2] A "controlled buy" is a purchase of a controlled substance by a CS under the direct control and supervision of a police investigator. The CS is searched for drugs and currency prior to the purchase. His/her vehicle (if it is to be utilized) is also searched for drugs and currency prior to the transaction. The CS is followed to and from the point of purchase and visual contact is attempted to be maintained at all times, except when he/she has actually entered any structure where the purchase is to take place. After the purchase, the CS is followed back to a predetermined location where the drugs are relinquished to the investigating officer(s) and the CS, and any vehicle utilized by the CS, is again searched. When practicable and lawful, the CS is equipped with recording equipment to attempt to capture an audio/video recording of the deal.

provided information that led to the arrest of subjects and the seizure of controlled substances and currency.

16. Your affiant knows that CSs often have criminal convictions for retail theft, possession of drug paraphernalia, simple possession, endangering the welfare of children, and driving under the influence. CS 2 has criminal convictions for some of those offenses. Your affiant knows that CS 2 is a drug user. Your Affiant also knows that CS 2 cooperated/is cooperating with detectives in exchange for leniency on pending/potential charges. Nevertheless, your Affiant submits that the information provided by CS 2 for the purpose of this Affidavit is credible and reliable based on corroboration of CS 2's information by other CSs and the investigation.

## PROBABLE CAUSE

17. In June 2020, Somerset County Detectives received several call-in reports from multiple residents of the Roof Garden Trailer Court regarding alleged drug distribution activity occurring at 108 Lillian Lane, Somerset, PA 15501.

18. On June 23, 2020, CS 1 contacted Somerset County Detective Michael Volk and advised that an individual would arrive at 108 Lillian Lane, Somerset, PA 15501 to deliver a quantity of methamphetamine. The relevant messages exchanged between Detective Volk and CS 1 are set forth below:

| | |
|---|---|
| MV: | Harold still coming. How much he dropping, how much cash he picking up? |
| CS 1: | Harold still coming?? |
| MV: | [To 108 Lillian Lane][3] |
| CS 1: | Yes sir. |
| MV: | Isn't that what you called him? |
| CS 1: | There will be a half pound or so there right before [NAME REDACTED] rolls in to pick it up |

---

3   Actual text omitted to protect the identity of CSs.

| | | |
|---|---|---|
| MV: | How much cash is Harold picking up? | |
| CS 1: | 5k | |
| MV: | [NAME REDACTED] meeting him at the trailer? | |
| CS 1: | Yes sir | |
| CS 1: | In front | |
| MV: | Won't go in? | |
| MV: | In front of where | |
| CS 1: | Mr. drug dealer will not get out of his car | |
| CS 1: | He thinks it makes him sade | |
| CS 1: | safe | |
| MV: | OK. Pulls right up to the trailer though? | |
| MV: | What's he drive? | |
| CS 1: | Yes sir where a man would park if he would | |
| CS 1: | Blackish chevy cruise? | |

19. Based on the information provided by CS 1, Detective Volk and other county detectives set up surveillance on 108 Lillian Lane.

20. Just after 12:00 p.m., detectives observed an individual on a motorcycle stop at and enter the trailer at 108 Lillian Lane. The motorcycle operator exited the trailer minutes later. As the motorcycle operator departed, detectives initiated a traffic stop for an unsafe turn. During the traffic stop, detectives recovered a quantity of methamphetamine, a quantity of marijuana, a methamphetamine smoking pipe, and $1,500 in crisp, clean U.S. currency. Detectives also recovered two bank receipts showing withdrawals of $1,000 and $800, respectively.

21. Following this traffic stop, detectives conducted a "knock-and-talk" at 108 Lillian Lane. During the interaction with detectives, the occupant of the residence told detectives that there was marijuana inside. Based on this information, detectives applied for a search warrant for the residence.

22. During the search, detectives recovered, among other items, $1,091 in U.S. currency, approximately $300 of which consisted of crisp, clean bills consistent with those seized from motorcycle operator, and several bags of marijuana, a digital scale, and other drug paraphernalia.

23. During/following the search, CS 2 contacted Detective Volk and advised that a large quantity of the U.S. currency detectives seized from the trailer belonged to a methamphetamine distributor.[4] CS 2 further advised that the methamphetamine distributor was to pick up methamphetamine from 108 Lillian Lane that day. CS 2 stated that "Terrell", who would be driving a black Chevy Cruze with leather seats and dashboard touchscreen display, will park in front of 108 Lillian Lane that afternoon. CS 2 told detectives that the occupant of 108 Lillian Lane would exit the trailer and meet with Terrell inside the Chevy Cruze to complete the transaction. The occupant would bring the methamphetamine provided by Terrell inside the trailer and later provide it to the methamphetamine distributor. CS 2 advised that transactions had occurred this way in the past. CS 2 stated that Terrell would be bringing three (3) ounces of methamphetamine to 108 Lillian Lane at approximately 5:00 p.m.

24. On June 23, 2020, between 2:36 p.m. and 2:55 p.m., Detective Volk exchanged the following text messages with CS 2 regarding the delivery of methamphetamine by Terrell:

    CS 2:  He said around 5
    MV:    Sounds like a plan
    MV:    How much he bringing
    CS 2:  3 I think I do talking to him now about that
    MV:    K

25. Following this conversation, Detective Volk asked CS 2 if CS 2 could request that Terrell bring six (6) ounces of methamphetamine with him, instead of three. CS 2 did.

26. The conversation between Detective Volk and CS 2 continued between 3:56 p.m. and 4:30 p.m.:

    MV:    What up
    CS 2:  He just pulled out hes going to pick up his son and the stuff. He said yes 6 ozs he can do that

---

4   CS 2 provided the name of this individual to detectives. However, it has been omitted from this Affidavit as that individual is not charged here.

    CS 2:  5:30
    CS 2:  U good with 5:30?
    MV:   Yes
    CS 2:  Alright

27. Meanwhile, detectives worked to identify "Terrell." Based on information learned through prior investigations, detectives suspected "Terrell" to be "Terrell Ickes."

28. Between 5:51 p.m. and 6:36 p.m., Detective Volk and CS 2 exchanged additional text messages:

    MV:   Whats up
    CS 2:  Hes on his way now with 6
    MV:   K
    CS 2:  Im going to get something to eat do he will be pulling in soon
    MV:   Ok
    CS 2:  I think hes at [108 Lillian Lane]

29. Indeed, at around 6:30 p.m., detectives conducting surveillance at the Roof Garden Trailer Court observed a black Chevy Cruze pull in and park in front of 108 Lillian Lane.

30. Detective Volk walked up to the side of the Chevy Cruze. Through the window, Detective Volk could see that the car had leather seats and a touchscreen on the dashboard.

31. Detective Volk knocked on the window and asked the driver to step out of the vehicle and show some identification. Detective Volk identified the driver as "Terrell Ickes" from his Pennsylvania Driver's License.

32. Based on the information provided by CS 1 and CS 2, Detective Volk then conducted a probable cause search of the Chevy Cruze.

33. Located on the back seat, Detective Volk found a Subway sandwich bag. Upon opening the Subway bag, Detective Volk discovered what appeared to be approximately six ounces (in five baggies) of suspected methamphetamine. Inside the glove compartment,

Detective Volk discovered an undetermined amount, estimated to be between $10,000 to $15,000, of U.S. currency.[5]

34. Following discovery of the suspected methamphetamine, Detective Volk provided Mr. Ickes with his Miranda warnings.

35. The suspected methamphetamine, money, and vehicle were secured, and Mr. Ickes was placed under arrest and transported for booking.

36. During the booking process, while in the presence of Somerset County Detective Todd Sherle, Mr. Ickes made the unsolicited remark that he "was just trying to make a quick buck."

37. On July 2, 2020, an individual ("Source of Information 1" or "SOI 1") appeared at the Somerset County District Attorney's Office and advised that he/she had additional information regarding Terrell Ickes.

38. SOI 1, whose identity is known to your Affiant, met with Detective Volk and advised that he/she lived in the same apartment complex as Mr. Ickes (129 Village Road, Friedens, PA).

39. SOI 1 advised Detective Volk that Mr. Ickes had told him/her that he had hidden a tub containing $26,000 worth of methamphetamine beneath an ash pile in the apartment complex's backyard.

40. The following day (July 3, 2020), SOI 1 contacted Detective Volk and notified him that Mr. Ickes would not be at the apartment complex that afternoon.

---

[5] The money was bagged and placed in secure evidence. Detective Volk did not count the money because he planned on submitting the money for ion scanning and did not want to contaminate the money by handling it.

41. Somerset County Detective John Loidici and another officer responded to the apartment complex. Behind the fire pit they located an ash pile with a black plastic bag sticking out of it. Detective Loidici photographed the area and exhumed the garbage bag. Inside the bag, Detective Loidici found a sealed bucket. The officers transported the bucket back to their station and opened it. Inside the bucket they located a large mailing envelope containing a large quantity of suspected methamphetamine. Beneath the mailing envelope, they located a notebook. Based on your Affiant's training and experience, the notebook contained entries consistent with "owe sheets." The notebook also contained an entry listing Mr. Ickes's girlfriend's name, date of birth, and address.

42. As part of the investigation, detectives sent the approximately six ounces of suspected methamphetamine seized from the Chevy Cruze and the larger quantity of suspected methamphetamine found in the bucket to Molecular Dx, a forensic laboratory, for testing to determine the presence of methamphetamine, its purity, and if any chemical similarities exist between the methamphetamine seized from the Chevy Cruze and the methamphetamine seized from the bucket.

43. Lab results showed that the suspected methamphetamine seized from the Chevy Cruze was contained in five bags. The five bags had a total net weight of 167.65 grams.[6] Each of the five bags contained methamphetamine with purity levels ranging between 79.3% and 82.8%.

44. Lab results showed that the suspected methamphetamine seized from the bucket had a net weight of 446.2 grams and contained methamphetamine that was 82.1% pure.

---

[6] 167.65 grams equals approximately 5.99 ounces.

45. Further, the lab results state that the methamphetamine seized from the Chevy Cruze and the methamphetamine seized from the bucket, "demonstrate several physical and chemical features in common, consistent with an association between contents."

## CONCLUSION

46. Based on the foregoing, your Affiant respectfully submits that there is probable cause to find that Terrell Robison ICKES, committed the offense of Possession with Intent to Distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).

Respectfully submitted,

/s/ *Christopher M. Balchon*
Christopher M. Balchon
DEA Special Agent

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 41(b)(2)(A),
this 5th day of February, 2021.

_____
KEITH A. PESTO
United States Magistrate Judge